IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MIRAMAR PETROLEUM, INC., a | § | |
| TEXAS CORPORATION | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| UNDERWRITERS AT LLOYDS | § | |
| LONDON, BRIT SYNDICATE 2987 | § | |
| A/K/A LLOYD'S OF LONDON | § | |
| Defendant. | § | **JURY DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE COURT:

Now comes Plaintiff, Miramar Petroleum, Inc., ("Miramar") a Texas Corporation in good standing ("Miramar") complaining of Defendant, Underwriters at Lloyds London, Brit Syndicate 2987 a/k/a as Lloyd's of London, (hereinafter Lloyd's") and for causes of action would show the following:

**A. PARTIES**

1.    Plaintiff, Miramar Petroleum, Inc., is a Texas Corporation having its principal place of business in Nueces County, Texas.

2.    Defendant, Underwriters at Lloyds London, Brit Syndicate 2987 a/k/a Lloyd's of London ("Lloyd's") is a foreign insurance company authorized to do business in the State of Texas and who may be served at the following addresses:

      a)     Texas Commissioner of Insurance
              333 Guadalupe Street
              P.O. Box 149104
              Austin, Texas 78714

b)    Mendes & Mount
      750 Seventh Ave.
      New York, NY 10019-6829

## B. JURISDICTION

3.    The Court has jurisdiction over the lawsuit under 28 U.S. (a) Section 1332 (a) (1)

because Miramar and Lloyd's are citizens of different and foreign states and the amount

in controversy exceeds $75,000.00, excluding interest and costs.

## C. VENUE

4.    Venue is proper in this district and division under 28 USC 1391 (a) (2)/1391 (b)

(2) because a substantial part of the events or omissions giving rise to this claim occurred

in this district and division as is alleged hereinafter.

## D. CONDITIONS PRECEDENT

5.    All conditions precedent have been performed or have occurred (Fed. R. Civ. P. 9

(c) except for a demand pursuant to Chapter 38, Texas Civil Practice & Remedies Code

being sent via certified mail on the date of filing of this suit.

## E. FACTS

6.    On or about April 1, 2013, Miramar began to drill a new "Wildcat" well in

Jackson County, Texas. The well was to be drilled to a total depth of up to 8,700 feet to

the objective geologic zone. (Par. 3, page 1 of Drilling Contract excerpt attached hereto

as Ex. "A" and by reference made a part hereof) (Ex. "A")

7.    The drilling was carried out by one Nicklos Drilling Company under a Standard

Form "IADC" Daywork contract entered into on February 22, 2013.

8.      Under the Drilling Contract, (Ex. "A") **Miramar had the contractual obligation to have all equipment and the drilling operations carried out under its care, custody and control**. (Page 1 of Ex. "A")

9.      Drilling proceeded from April 1, 2013 until April 15, 2013 when a "drilling break" occurred at approximately 8,638 feet giving rise to a surface and subsurface "blow out" and "well out of control."

10.     Although the "blow-out" preventers were activated several minutes after the initial flow was observed in an attempt to bring the well under control, the well was never shut-in successfully because of the occurrence of an underground "blow out" hereafter described in more detail and which continued to be out of control although various methods were attempted to bring the "well under control".

11.     More specifically, the well continued to be "out of control" although the "blow out" preventers were activated on numerous occasions between approximately 4:55 p.m. on April 15, 2013 and 3:00 p.m. on April 16, 2013 at which time the drill pipe had become stuck in numerous places and the annulus bridged over plugging any further movement upwards through the annulus of drilling fluids and gas.

12.     This all directly resulted from the attempt to shut-in the well by activating the "blow out" preventers (BOP'S) when the well was observed flowing fluids and escaping high pressure gas; this activation of the BOP'S forced the high pressure gas to "emanate from one subsurface depth interval (i.e., 8,638 feet) to another subsurface depth interval via the well bore of the well at issue giving rise to the underground "well out of control". This "out of control" occurrence continued with the heavy weighted mud and escaping gas fracturing and entering the "weaker" stratum, into which more than 900 barrels of

heavier weight "mud" were pumped down the drill pipe over a 22 plus hour period until the drill pipe finally became stuck at approximately 3:00 o'clock p.m. on April 16, 2013 and the annulus became plugged down-hole thus shutting off any further upward movement of drilling fluids and gas.

13.     After the 22 hours of attempting to bring the "well under control", and as a direct result of the loss of mud into adjacent subsurface strata, down-hole equipment was permanently stuck thereby giving rise to damages for (a) expenses incurred in attempting to regain control of the well; (b) replacement of down-hole equipment, (c) cost of redrilling a replacement well, (d) loss of drilling fluids to underground loss of fluids; and, (e) other expenses all directly attributable to the well at issue being "out of control" for over 22 hours.

## POLICY AT ISSUE

14.     This is a suit brought by Miramar to recover monies due under a "control of well" insurance policy issued by Lloyd's (Policy Number AMW126397).

15.     **The very essence of this policy was to insure and protect Miramar against losses attributable to a "well out of control," both surface and subsurface.**

16.     The policy covered the period from May 16, 2012 to May 16, 2013 and was in full force and effect at the time of the surface and subsurface "blow out"/"out of control" well at issue. (See excerpts -Ex. "B" page 1 attached hereto and by reference made a part hereof).

17.     There are various different coverages under the policy.

## SECTION 1A

18.    Section 1A "Well Out of Control" of the Policy (see excerpt Ex. "B") expressly

provides the following:

"Underwriters agrees, subject to the Combined Single Limit of Liability, terms and

conditions of this Certificate, **to reimburse the Assured for expenses incurred:**

    (a)  **in regaining or attempting to regain control of a Well Out of Control** including any other Well which gets out of control as a direct result of a Well Out of Control; and

    (b)  in extinguishing or attempting to extinguish (1) fire above the surface of the ground or water bottom from a Well Out of Control or any other Well(s) which are burning as a result of a Well Out of Control (2) fire above the surface of the ground or water bottom which may endanger the Well(s) insured.

**In any circumstances, Underwriters' liability for expenses incurred in regaining or attempting to regain control of Well(s) Out of Control shall cease <u>WHEN</u> it becomes a Well Brought Under Control.**

•••

### <u>TERMINATION OF EXPENSES</u>

**In any circumstances, Underwriters' liability for expenses incurred in regaining or attempting to regain control of a Well(s) Out of Control shall cease <u>WHEN</u> it becomes a Well Brought Under Control."** (Emphasis added)

19.    Under paragraph 3 ("<u>Definitions</u>) under "Common Conditions To Cost of Well

Control" of the Policy, (excerpt Ex. "B") the <u>following definitions</u> are spelled out:

    II.  The term "**well out of control**" shall be defined as a Well insured from which and only when there exists an unintended flow of drilling fluid, oil, gas, water, or other substance, **either** above the surface of the ground or water bottom **or emanating from one subsurface depth interval to another subsurface depth interval via the bore of a well insured,** and

          **1. Which flow [i.e., both surface and/or subsurface] cannot be (a) stopped by use of the equipment on site and/or the blowout preventer,** storm chokes or other equipment required by Clauses 5 and 14 of the Common Conditions; **or** (b)

stopped by **increasing the weight by volume of drilling fluid or** by the use of other conditioning materials in the Well; Or

2.    Which flow is declared to be out of control by the appropriate Regulatory Authority.

Nevertheless, and for the purposes of this insurance, a Well shall not be defined as a Well Out of Control because of the existence of Occurrence of a flow of oil, gas, or water or other substance into the Well bore which can be circulated out or bled off through the surface controls.

JJ.    The term "**well brought under control**" shall be defined as a Well Out of Control at such time that the flow giving rise to a claim hereunder stops, is stopped or can be stopped **and drilling, deepening, servicing, workover, completion, reconditioning or other operation(s) taking place in the Well immediately prior to the Occurrence giving rise to a claim hereunder is (are) resumed or can be resumed; or the Well is or can be returned to whatever status that existed immediately prior to the Well becoming a "Well Out of Control;" "or the flow giving rise to the claim (i.e., et 8,638 feet) hereunder is or can be safely diverted into commercial production." (Emphasis and parenthesis added)**

## UNDERGROUND "BLOW OUT" COVERAGE INCLUDED

20.    Under the express terms of the definition of "well out of control" under the policy at issue, (Ex. "B", par. 3 II) the **"unintended flow"** can occur **at one or more of three locations**:

(1) above the surface of the ground: "**or**"
(2) above the surface of the "water bottom;" "**or**"
(3) **emanating from one subsurface depth interval to another subsurface depth interval ... via the bore of the well**

21.    The third source of "unintended flow" shown above is **commonly called an underground or subsurface "blow out"** and is sometimes insured under an endorsement to an "above the surface of the ground **policy**;" other times, they are

covered under a "**subsurface**" "well out of control" **provision combined under the terms of the same policy** (i.e. "surface" policy) **without the need of an endorsement**.

22.     **In the instant case, both the "surface" and "subsurface" "blow out" insurance coverages are combined under the original policy**.

23.     As stated, an original policy which does  not contain the coverage of a flow "**emanating from one subterranean stratum to another subterranean stratum**" requires an endorsement for such additional coverage such as is shown for example on Exhibit "C" attached hereto and by reference made a part hereof.

24.     In either case; whether combined into the original policy or added by an endorsement, "surface" and "subsurface" or underground "blow-outs" are covered separately and equally.  In the instant case, the **underground or subsurface "blow-out" protection is afforded under the combined "blow-out" protection policy language under the express definition contained under 3 II shown in paragraph 19 hereinabove**.

### POLICY APPLICATION
### SECTION 1A "WELL OUT OF CONTROL"

25.     Clearly, Section 1A ties together (as it should) the terms of two events: (1) "Well Out of Control" and (2) "Well Brought Under Control."  The event of **coverage for expenses and losses is triggered WHEN** (1) the well is "out of control" (**i.e., surface or subsurface**) and the expenses **END WHEN** (2) the well is "**brought under control**" – (i.e. surface or subsurface) whether the time interval is one minute, one month or longer.

26.     Under the express terms of Section 1A, Lloyd's agreed to "reimburse the assured ("Miramar") for **expenses incurred**.

"(a) **In regaining, or attempting to regain control of a well out of control ...**" (i.e., first event)

In any circumstance, **underwriters' liability for expenses** incurred in ... attempting to regain control of well(s) out of control shall cease **WHEN it becomes a well brought under control**" (i.e., second event) (Emphasis and explanatory parentheses added)

27.     In this case, according to the "Driller's Electronic Drilling Recorder data", after the well initially began to flow from high pressure gas after it encountered a drilling break at approximately 8,638 feet, various attempts were made to shut the well in and stop the flow.   When the "blow out" preventers were closed, drilling fluids ("mud") which was flowing out of the annulus together with the full force of the high pressure gas which was causing the flow, were now directed against the shallow, poorly compacted, saltwater bearing sands, causing them to fracture.

28.     Then, when heavier weight drilling "mud" was pumped down the drill pipe into the annulus, the heavier "mud" entered the weaker subsurface stratum thereby reducing the hydrostatic head even more making it impossible to stop the flow of the "out of control well" by the use of "blow-out" preventers and other equipment at the surface or additional mud.

29.     Looking at subparagraph JJ of Section 3 of definitions under the policy (Ex. "B," par. 3.JJ) under the express definition of **"Well Brought Under Control"** various events must occur, which include:

(a)  "at such time that the flow **giving rise to a claim hereunder, stops ...**"

**"and"**

(b)  "**drilling ... completion ... or other operation taking place in the Well immediately prior to the occurrence giving rise to a claim hereunder** is (are) resumed or **can be resumed**"

**"Or"**

    (c)    "the well is returned **to whatever status that existed immediately** prior to the well becoming a well out of control; "Or"

    (d)    "the **flow giving rise to the claim** (i.e., at 8,638 feet) hereunder is or can be safely **diverted** into commercial production" (Emphasis and parenthesis added) (Par. JJ of Definitions)

30.    Under the aforementioned express definition of "**well brought under control**" and based upon the facts that existed on April 15 and 16, 2013, **at no time after the "blow out" on April 15, 2013, was there a resumption of drilling or completion at the objective sand (geologic zone) because of permanent down-hole damage to the hole; and the well was never "returned to whatever status that existed immediately prior to the well becoming a well out of control" …; and the "flow giving rise to the claim (i.e., at 8,638 feet) could not be stopped due to the underground blowout and could not be therefore, safely diverted into production."**

31.    Because of the foregoing contractual language and applicable facts, Miramar is entitled to be reimbursed under Section 1A of the Policy for all expenses incurred until the well is "brought under control" and **which event has not yet occurred.**

### SECTION 1B "REDRILLING/EXTRA EXPENSE"

32.    Section 1B of the Policy (see Ex. "B"), Lloyd's further agreed that

> "… subject to the Combined Single Limit of Liability, terms and conditions of **this Certificate to reimburse the Assured for actual costs and expenses incurred to restore or redrill a Well insured or any part thereof, which has been lost <u>or otherwise damaged</u> as a result of an Occurrence giving rise to a claim which would be recoverable under Section 1A of this Certificate if** the Assured's Retention applicable to Section 1A were not, subject to the following conditions …" (Emphasis added)

33.     The objective geologic zone to be drilled and from which production was to come was at 8,627 feet.

34.     The well "blew out" and was rendered "out-of-control" and the flow emanating at approximately 8,638 feet was not able to be stopped with blow out preventers or other "BOP" equipment and which could not be **diverted** into production, rendering impossible entry into the objective geologic zone at about 8,627 feet thus **entitling Miramar the contractual right due to Lloyd's anticipatory breach of contract,** under said Section 1B of the Policy **for "actual costs and expenses to be incurred to redrill another well to the depth of 8,627 feet, being the objective sand for which the drilling was undertaken.**

## SECTION 2
## "CARE, CUSTODY AND CONTROL"

35.     Section 2 of the Policy (See Ex. "B") provides as follows:

> "... this Certificate covers the **Assured's legal or contractual liability** as oil lease operator(s) (or Co-Venturer(s) where applicable) for **physical loss or damage to, or expenses of salvage of, oilfield equipment, including but not limited to drill pipe, drill collars, subs, drill bits and core barrels leased or rented by the Assured or in its care, custody and control at the site of any Well insured** under Section 1A of this Certificate." (Emphasis added)

> Thus, Miramar is covered for "**oilfield equipment**" losses or damages which arise out of

> (1) Any **legal** liability of Miramar;
>     **Or**
> (2) Any **contractual liability**;
>     **Or**
> (3) Any leased or rental oil field equipment;
>     **Or**
> (4) Any "oil field equipment" that is under Miramar's "care, custody and control" at the well site.

36.     The said **Drilling Contract** under which drilling of the well at issue was carried

out, (Ex. "A") expressly provides ***inter alia***, as follows:

> "For purposes hereof, the term "Daywork" or Daywork Basis"
> means Contractor shall furnish equipment, labor, and perform
> services as herein provided, for a specified sum per day **under
> the direction, supervision and control of Operator (inclusive
> of any employee, agent, consultant, [the assured had,
> contracted with Cimarron Engineering, Corp. to supervise
> the drilling operations for and on behalf of the assured as
> "Operator"] or subcontractor engaged by Operator to direct
> drilling operations).** When operating on a Daywork Basis,
> contractor shall be fully paid at the applicable rates of payment
> and assumes only the obligations and liabilities stated herein.
> Except for such obligations and liabilities specially assumed by
> Contractor, **Operator shall be responsible, and assumes
> liability for all consequences of operations** by both parties
> while on a Daywork Basis, including results and all other risks of
> liabilities incurred in or incident to such operations. (Added
> bracket language) (P. 1 of Ex. "A")

● ● ●

> 8.2  Subject to the terms hereof, and at Operator's cost, at all times
> during the drilling of the well, **Operator shall have the right to
> control the mud program**, and the drilling fluid must be of a
> type and have characteristics and be maintained by Contractor in
> accordance with the specifications shown on Exhibit "A". (added
> bracket language) (Par. 8.2, of P. 3)

● ● ●

> 14.2  **Contractor's in-Hole Equipment: Operator shall assume
> liability** at all times **for damage to or destruction of
> Contractor's in-hole equipment, including but not limited to,
> drill pipe, drill collars, and tool joints** and Operator shall
> reimburse Contractor for the value of any such loss or damage:
> the value to be determined by agreement Contractor and Operator
> as current as current repair costs or <u>100</u> percent of current new
> replacement cost of such equipment delivered to the well site.
> (Added bracket language) (Par. 14.2 of P. 4)

● ● ●

> 14.10  **Liability for Wild Well:  Operator shall be liable for the
> cost of regaining control of any wild well**, as well as for **cost of**

removal of any debris and **cost of property remediation and restoration,** and Operator shall release, protect, defend and **indemnify Contractor** and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost." (All emphasis added) (Par. 14.10, P. 5 of Ex. "A")

37. Therefore, Miramar has coverage under Section 2 under the following express coverage provisions for loss or damage to oilfield equipment:

(1) **Legal liability;**
**And**
(2) **Contractual liability;**
**And**
(3) **Rented oilfield equipment;**
**And**
(4) **Oilfield equipment that is under Miramar's "care, custody and control" at the well site.**

38. Miramar further suffered substantial expenses in unsuccessfully attempting to regain control of the well (and which is not today a "well brought under control" as defined in the drilling contract); and, to such extent, in addition to the loss of equipment, Miramar is entitled to be "reimbursed" under this action

## F. **LEGAL CAUSES OF ACTION**
## **COUNT I**
## **BREACH OF CONTRACT**

39. Miramar incorporates by reference paragraphs 1 through 38 and 57 through 60 herein.

40. Lloyd's is in breach of its contract in denying coverage under the policy at issue and for which Miramar sues to recover its damages herein. Further, Miramar would show that Lloyd's act and conduct in denying the claim constituted a repudiation of the contract and amounted to an anticipatory breach of contract for which Miramar is entitled to recover now all unaccrued damages provided for under said Section 1 B of the policy.

(Kilcuit Tex. Mining Co. v. Inglish, 8655 S.W. 2d 240, 245 (Tex. App-Waco 1993, writ denied)

41.    As a direct and proximate result of Lloyd's breach and anticipatory breach of contract, Miramar sustained damages for which Lloyd's is contractually obligated to pay Miramar now under the policy and without limitation, under Section 1A, ("Well Out of Control"); Section 1B ("Redrilling/Extra Expense") for anticipatory breach of contract; and, Section 2 ("Care Custody and Contract") for loss or damage to both the hole and equipment all in amounts which far exceed the minimum jurisdictional requirements of this Court and for which Miramar seeks damages hereunder and which damages include those set out under Exhibit "D" attached hereto and by reference made a part hereof. Furthermore, as the well has not yet qualified under the contract definition of a "well brought under control", additional expenses will be incurred beyond what is shown as Exhibit "D."

## COUNT II
## G. VIOLATION OF UNFAIR CLAIM SETTLEMENT PRACTICE ACT (CHAPTER 542, TEXAS INSURANCE CODE)

42.    Plaintiff incorporates paragraphs 1 through 38 and 57 through 60 herein by reference.

43.    Lloyd's violated Section 542.003 (b)(4) of Chapter 542 of the Texas Insurance Code in the following respects:

> "(4) not attempting in good faith to effect a prompt fair and equitable settlement of a claim submitted in which liability has become reasonably clear."

44.    When the written claim was presented to Lloyd's, and after Lloyd's carried out its investigation into the facts, Lloyds' liability under the policy was reasonably clear, there

being no basis in fact or from the policy's terms on which a reasonable insurer would have relied to deny the claim.

45.     However, Lloyd's refused to pay all or any part of the claim.

46.     In the instant case, based upon the law and the facts available to Lloyd's showing clearly the presence of an underground "blow out," Lloyd's had no reasonable basis for denying the claim under the policy.

47.     Inasmuch as **the policy** was authored by Lloyd's and **clearly provides underground blow out insurance coverage** (see definition sub-paragraph 3 II and Ex. "C") and inasmuch as the facts made available and accessible to Lloyd's showed clearly that there was an underground or subsurface "blow out", **failure of Lloyd's to acknowledge that the claim was covered** under the policy **constituted bad faith** in that **Lloyd's either knew or should have known that the claim should not have been denied; therefore, Lloyd's acts and conduct constituted a "knowing" violation of Chapter 542, (Tex. Ins. Code)** giving rise to actual and exemplary damages for failure to honor and pay the claim as provided under the policy and which actual damages are set out in Exhibit "D" hereto attached in addition to **consequential damages**.

48.     **Such "knowing" conduct** on the part of Lloyd's **was also intentional, malicious, fraudulent or grossly negligent** entitling Miramar to **exemplary damages**.

49.     Notice of claim was duly and timely made by Miramar under Section 542.055 more than 60 days before filing suit herein and the claim was denied by Lloyd's in its totality.

50.     Additionally, Lloyd's is liable under Section 542.060 (Tex. Ins. Code), for "interest on the amount of the claim at the rate of 18% a year as damages together with

reasonable attorney's fees" and all costs all for which Miramar additionally sues herein to recover from Lloyd's under this Count II.

### COUNT III
### COMMON LAW BREACH OF DUTY OF
### DEALING FAIRLY AND IN GOOD FAITH

51.    Miramar incorporates paragraphs 1 through 38 and 57 through 60 herein by reference.

52.    A duty of good faith and fair dealing is based on the special relationship that exists between Lloyd's and Miramar under the policy. The parties do not have equal bargaining power; and Lloyd's has exclusive control of the evaluation, processing and payment or denial of Miramar's claim for the policy's benefits provided.

53.    Lloyd's acts and conduct in failing to deal fairly and in good faith resulted directly from its failure to perform under the policy on a reasonable basis; and, with particular reference to its claims practices, to investigate the insured's claims thoroughly and in good faith, by denying coverage after the investigation demonstrated bad faith as there is no reasonable basis for Lloyd's denying the claim. [Viles v. Sec. Nat'l Ins. Co. 788 SW 2d 566, 568 (Tex. 1990)]

54.    It is this special relationship that gives rise to a tort under the law and for which an insurance company who violates its duty of good faith and fair dealing is subject to damages and penalty sanctions.

55.    As a direct and proximate result of Lloyd's breach of its common law duty of good faith and fair dealing, Miramar has sustained damages as herein alleged and as set out in Exhibit "D" hereto attached and for which Miramar seeks recovery under this suit

in addition to consequential damages, exemplary damages, attorney's fees, prejudgment and post-judgment interests and costs.

## H. CHAPTER 541, TEXAS INSURANCE CODE VIOLATION CLAIMS

56.     Miramar has sent out a 60 day written Demand Letter to Lloyd's under Section 541 Texas Insurance Code for which Miramar will ask the Court to allow Miramar to amend to add additional counts should this case not be satisfied during said settlement period.  (See *State Farm Fire and Cas. Co. v. Pierce*, 845 S.W. 2d 427 (Tex. App-Amarillo, 1992, dis. agr.)

## I. DEMAND MADE

57.     Miramar has made demand for payment of its losses to Lloyds and Lloyd's has denied and repudiated any obligation under the policy to Miramar.  Additional demands are being made under Chapter 38, Texas Civil Practices & Remedies Code as well as Chapters 541, and 542 Texas Insurance Code.

## J. ATTORNEY'S FEES

58.     Miramar has retained an attorney to represent its interest in regard to this litigation and for which Miramar has agreed to pay reasonable and necessary attorney's fees.  Miramar seeks to recover its attorney's fees herein incurred under Chapter 38.001 et seq. Tex. Civ. Prac. & Remedies Code in addition to Section 541.152 and Section 542 of the Texas Insurance Code.

## K. JURY DEMAND

59.     Miramar demands a jury trial and tenders the appropriate fee with this Complaint.

## L. PRAYER

60.    Wherefore, premises considered, Plaintiff, Miramar Petroleum, Inc. requests that

Defendant, Lloyd's, Underwriters at Lloyd's, London, Brit Syndicate 2987 also known as

Lloyd's of London be duly served with citation and required to respond to this

Complaint; and that upon final disposition, Miramar have and recover judgment against

Lloyd's for the following:

a.     Actual damages;

b.     Consequential damages;

c.     Enhanced and exemplary damages;

d.     The highest pre-judgment and post-judgment interest allowed by law;

e.      Court costs;

f.     Attorney's fees at the trial level and additional attorney's fees in the event
       of appeal to the Appellate and Supreme Courts; and

g.     All other relief to which Miramar may be justly entitled.

Respectfully submitted,

Ronald W. Bradley
Attorney at Law
Texas Bar No.  02828500
4732 Yorkshire Trail
Plano, Texas  75093
Tel: (214) 704-1715
Fax: (469) 467-2284
**ATTORNEY FOR PLAINTIFF**

NOTE: This form contract is a suggested guide only and use of this form or any variation thereof shall be at the sole discretion and risk of the user parties. Users of the form contract or any portion or variation thereof are encouraged to seek the advice of counsel to ensure that their contract reflects the complete agreement of the parties and applicable law. The International Association of Drilling Contractors disclaims any liability whatsoever for loss or damages which may result from use of the form contract or portions or variations thereof. Computer generated form, reproduced under license from IADC.

Revised April, 2003

## INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS
## DRILLING BID PROPOSAL
## AND
## DAYWORK DRILLING CONTRACT - U.S.

TO: _____

Please submit bid on this drilling contract form for performing the work outlined below, upon the terms and for the consideration set forth, with the understanding that if the bid is accepted by _____
this instrument will constitute a Contract between us. Your bid should be mailed or delivered not later than _____ P.M. on _____, 20_____,
to the following address: _____

## THIS CONTRACT CONTAINS PROVISIONS RELATING TO INDEMNITY,
## RELEASE OF LIABILITY, AND ALLOCATION OF RISK –
## SEE PARAGRAPHS 4.9, 6.3(c), 10, 12, AND 14

This Contract is made and entered into on the date hereinafter set forth by and between the parties herein designated as "Operator" and "Contractor."

| OPERATOR: | MIRAMAR PETROLEUM, INC. |
|---|---|
| Address: | 302 N. CARANCAHUA, SUITE 1250 |
| | CORPUS CHRISTI, TEXAS 78401 |
| CONTRACTOR: | NICKLOS DRILLING COMPANY |
| Address: | 3355 W. ALABAMA SUITE 500 |
| | HOUSTON, TEXAS 77098 |

IN CONSIDERATION of the mutual promises, conditions and agreements herein contained and the specifications and special provisions set forth in Exhibit "A" and Exhibit "B" attached hereto and made a part hereof (the "Contract"), Operator engages Contractor as an independent contractor to drill the hereinafter designated well or wells in search of oil or gas on a Daywork Basis.

For purposes hereof, the term "Daywork" or "Daywork Basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of Operator (inclusive of any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). When operating on a Daywork Basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by Contractor, Operator shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

**1. LOCATION OF WELL:**
Well Name
and Number: __Santaella 91__
Parish/
County: __Jackson__ State: __Texas__ Field Name: _____
Well location and
land description: __Von Dohl Survey, A-585__

1.1 Additional Well Locations or Areas: __NA__

Locations described above are for well and Contract identification only and Contractor assumes no liability whatsoever for a proper survey or location stake on Operator's lease.

**2. COMMENCEMENT DATE:**
Contractor agrees to use reasonable efforts to commence operations for the drilling of the well by the __NA__ day of __NA__, 20__NA__.
or __Immediately following Saleco Oil & Gas Corporation's Bentsen-8 Haizar #4 well in Jackson County, Texas.__

**3. DEPTH:**
3.1 Well Depth: The well(s) shall be drilled to a depth of approximately __9,700/9,200__ feet, or to the __NA__ formation, whichever is deeper, but the Contractor shall not be required hereunder to drill well(s) below a maximum depth of __9,000__ feet, unless Contractor and Operator mutually agree to drill to a greater depth.

**4. DAYWORK RATES:**
Contractor shall be paid at the following rates for the work performed hereunder.

4.1 Mobilization: Operator shall pay Contractor a mobilization fee of $ __01,000.00__ or a mobilization day rate of $ __NA__ per day. This sum shall be due and payable in full at the time the rig is rigged up or positioned at the well site ready to spud. Mobilization shall include: __Move in Rig up Rig down.__

4.2 Demobilization: Operator shall pay Contractor a demobilization fee of $ __NA__ or a demobilization day rate during tear down of $ __NA__ per day, provided however that no demobilization fee shall be payable if the Contract is terminated due to the total loss or destruction of the rig. Demobilization shall include: __NA__.

4.3 Moving Rates: During the time the rig is in transit to or from a drill site, or between drill sites, commencing on __NA__, Operator shall pay Contractor a sum of $ __NA__ per twenty-four (24) hour day.

4.4 Operating Day Rate: For work performed per twenty-four (24) hour day with $ _____ more over the operating day rate shall be:

| Depth Interval | | Without Drill Pipe | With Drill Pipe |
|---|---|---|---|
| From | To | | |
| 0 | TD | $ 14,000.00 per day | $ 14,000.00 per day |
| | | $ per day | $ per day |
| | | $ per day | $ per day |

Using Operator's drill pipe $ __14,000.00__ per day.

The rate will begin when the drilling unit is rigged up or spudded in over the drilling location, or positioned over the location during spotting work, and ready to commence operations; and will cease when the rig is ready to be moved off the location.

EX "A"

(b)   By Operator: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, Operator shall have the right to direct the stoppage of the work to be performed by Contractor hereunder at any time prior to reaching the specified depth, and even though Contractor has made no default hereunder. In such event, Operator shall reimburse Contractor as set forth in Subparagraph 6.4 hereof.

(c)   By Contractor: Notwithstanding the provisions of Paragraph 3 with respect to the depth to be drilled, in the event Operator shall become insolvent, or be adjudicated a bankrupt, or file, by way of petition or answer, a debtor's petition or other pleading seeking adjustment of Operator's debts, under any bankruptcy or debtor's relief laws now or hereafter prevailing, or if any such be filed against Operator, or in case a receiver be appointed of Operator or Operator's property, or any part thereof, or Operator's affairs be placed in the hands of a Creditor's Committee, or, following time business days prior written notice to Operator if Operator does not pay Contractor within the time specified in Subparagraph 6.2 all undisputed items due and owing, Contractor may, at its option, (1) elect to terminate further performance of any work under this Contract and Contractor's right to compensation shall be as set forth in Subparagraph 6.4 hereof, or (2) suspend operations until payment is made by Operator in which event the standby time rate contained in Subparagraph 4.8 shall apply until payment is made by Operator and operations are resumed. In addition to Contractor's rights to suspend operations or terminate performance under this Paragraph, Operator hereby expressly agrees to protect, defend and indemnify Contractor from and against any claims, demands and causes of action, including all costs of defense, in favor of Operator, Operator's co-venturers, co-lessees and joint owners, or, any other parties arising out of any drilling commitments or obligations contained in any lease, farmout agreement or other agreement, which may be affected by such suspension of operations or termination of performance hereunder.

6.4   Early Termination Compensation:

(a)   Prior to Commencement: In the event Operator terminates this Contract prior to commencement of operations hereunder, Operator shall pay Contractor as ~~liquidated damages and not as a penalty a sum equal to the standby time rate (Subparagraph 4.8) for a period of ___ 18 ___ days of standby time in the amount of $ _____.~~

(b)   Prior to Spudding: If such termination occur after commencement of operations but prior to the spudding of the well, Operator shall pay to Contractor the sum of the following: (1) all expenses reasonably and necessarily incurred and to be incurred by Contractor by reason of the Contract and by reason of the premature termination of the work, including the expense of rigging or other crew members and supervision directly assigned to the rig (2) ten percent (10%) of the amount of such reimbursable expenses; and (3) a sum calculated at the standby time rate for all time from the date upon which Contractor commences any operation hereunder down to such date subsequent to the date of termination as will afford Contractor reasonable time to dismantle its rig and equipment provided, however, if the Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate, less any unnecessary labor, from that date subsequent to termination upon which Contractor completes dismantling its rig and equipment until the end of the term or, ~~but not less than 18 days at the standby rate.~~

~~(c)   Subsequent to spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor: (1) the amount for all applicable rates and all other charges and reimbursements due to Contractor but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for ___ days at the applicable rate. Without this Plus* and the extent amount due for drill pipe used in connection with the above minus or (2) all the disallow of Contractor and to less of the foregoing, Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus a lump sum of $ ___ provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the Force Majeure Rate less any unnecessary labor from the date of termination until the end of the term or.~~

## 7.   CASING PROGRAM

Operator shall have the right to designate the points at which casing will be set and the manner of setting, cementing and testing. Operator may modify the casing program, however, any such modification which materially increases Contractor's hazards or costs can only be made by mutual consent of Operator and Contractor and upon agreement as to the additional compensation to be paid Contractor as a result thereof.

## 8.   DRILLING METHODS AND PRACTICES

8.1   Contractor shall maintain well control equipment in good condition at all times and shall use all reasonable means to prevent and control fires and blowouts and to protect the hole.

8.2   Subject to the terms hereof, and at Operator's cost, at all times during the drilling of the well, Operator shall have the right to control the mud program, and the drilling fluid must be of a type and have characterization and be maintained by Contractor in accordance with the specifications shown in Exhibit "A".

8.3   Each party hereto agrees to comply with all laws, rules, and regulations of any federal, state or local governmental authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Exhibit "B" shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect.

8.4   Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form shall be furnished by Contractor to Operator.

8.5   If requested by Operator, Contractor shall furnish Operator with a copy of delivery tickets covering any material or supplies provided by Operator and received by Contractor.

## 9.   INGRESS, EGRESS, AND LOCATION:

Operator hereby assigns to Contractor all necessary rights of ingress and egress with respect to the tract on which the well is to be located for the performance by Contractor of all work contemplated by this Contract. Should Contractor be denied free access to the location for any reason not necessarily within Contractor's control, any time lost by Contractor as a result of such denial shall be paid for at the standby time rate. Operator agrees at all times to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site in an ordinarily equipped highway type vehicle. If Contractor is required to use bulldozers, tractors, four-wheel drive vehicles, or any other specialized transportation equipment for the movement of necessary personnel, machinery, or equipment over access roads or on the drilling location, Operator shall furnish the same at its expense and without cost to Contractor. The actual cost of repairs to any transportation equipment furnished by Contractor or its personnel damaged as a result of improperly maintained access roads or location will be charged to Operator. Operator shall reimburse Contractor for all amounts reasonably expended by Contractor for repairs and/or replacement of roads, bridges and related or similar facilities (public and private) required as a direct result of a rig move pursuant to performance hereunder. Operator shall be responsible for any costs associated with locating the rig because of location setting.

## 10.   SOUND LOCATION:

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a casing and cementing

program adequate to prevent soil and subsoil waste etc. It is recognized that Operator has superior knowledge of the location and assumes routes to the location, and must advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and communication lines) which Contractor might encounter while on route to the location or during operations hereunder. In the event subsurface conditions cause a caving or shifting of the location surface, or if soaked conditions prove unsatisfactory to properly support the rig during routine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Subparagraph 14.4 hereof, reimburse Contractor for all such loss or damage including removal of debris and payment of Force Majeure Rate during repair and/or demobilization if applicable.

## 11.  EQUIPMENT CAPACITY

Operations shall not be attempted under any conditions which exceed the capacity of the equipment specified to be used hereunder or where maximum water depths are to exceed _____ feet. Without prejudice to the provisions of Paragraph 14 hereunder, Contractor shall have the right to make the final decision as to when an operation or attempted operation would exceed the capacity of specified equipment.

## 12.  TERMINATION OF LOCATION LIABILITY

When Contractor has completed operations at the well location, Operator shall thereafter be liable for damage to property, personal injury or death of any person which occurs as a result of conditions of the location and Contractor shall be relieved of such liability; provided, however, if Contractor shall subsequently reenter upon the location for any reason, including removal of the rig, any term of the Contract relating to such reentry activity shall become applicable during such period.

## 13.  INSURANCE

During the life of this Contract, Contractor shall at Contractor's expense maintain, with an insurance company or companies authorized to do business in the state where the work is to be performed or through a self-insurance program, insurance coverage of the kind and in the amount set forth in Exhibit "A", insuring the liabilities specifically assumed by Contractor in Paragraph 14 of this Contract. Contractor shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Operator. For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator. Operator will, as well, cause its insurer to waive subrogation against Contractor for liability it assumes and shall maintain, at Operator's expense, or shall self insure, insurance coverage as set forth in Exhibit "A" of the same kind and in the same amount as is required of Contractor, insuring the liabilities specifically assumed by Operator in Paragraph 14 of this Contract. Operator shall procure from the company or companies writing said insurance a certificate or certificates that said insurance is in full force and effect and that the same shall not be canceled or materially changed without ten (10) days prior written notice to Contractor. Operator and Contractor shall cause their respective underwriters to name the other mutually insured but only to the extent of the indemnification obligations assumed herein.

## 14.  RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK:

14.1  Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraph 10 or Subparagraph 14.2.

14.2  Contractor's In-Hole Equipment: Operator shall assume liability at all times for damage to or destruction of Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage; the value to be determined by agreement between Contractor and Operator as current repair costs plus _____ percent of current new replacement cost of such equipment delivered to the well site.

14.3  Contractor's Equipment - Environmental Loss or Damage: Notwithstanding the provisions of Subparagraph 14.1 above, Operator shall assume liability at all times for damage to or destruction of Contractor's equipment resulting from the presence of H2S, CO2 or other corrosive elements that enter the drilling fluids from subsurface formations or the use of corrosive, destructive or abrasive additives in the drilling fluids.

14.4  Operator's Equipment: Operator shall assume liability at all times for damage to or destruction of Operator's or its environmental, on-location or joint owner equipment, including, but not limited to, casing, tubing, well head equipment, and platform if applicable, regardless of when or how such damage or destruction occurs, and Operator shall release Contractor of any liability for any such loss or damage.

14.5  The Hole: In the event the hole should be lost or damaged, Operator shall be solely responsible for such damage to or loss of the hole, including the casing therein. Operator shall release Contractor and its suppliers, contractors and subcontractors of any for of any liability for damage to or loss of the hole, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any for from and against any and all claims, liability, and expense relating to such damage to or loss of the hole.

14.6  Underground Damage: Operator shall release Contractor and its suppliers, contractors and subcontractors of any for of any liability for, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any for from and against any and all claims, liability, and expense resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas, or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the surface of the earth, and for any loss or damage to any formation, strata, or reservoir beneath the surface of the earth.

14.7  Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from , and shall protect, defend and indemnify Contractor from and against, any such liability.

14.8  Contractor's Indemnification of Operator: Contractor shall release Operator of any liability for, and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor or their employees, or Contractor's invitees, on account of bodily injury, death or damage to property. Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnity shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.9  Operator's Indemnification of Contractor: Operator shall release Contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or

Form provided by Forms On-A-Disk
(214) 340-9429 - FormsOnADisk.com

subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.5 on account of bodily injury, death or damage to property. Operator's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.5 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitors, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris and cost of property remediation and restoration, and Operator shall release, protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any liability for such cost.

14.11 Pollution or Contamination: Notwithstanding anything to the contrary contained herein, except the provisions of Paragraphs 10 and 12, it is understood and agreed by and between Contractor and Operator that the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Operator from and against all claims, demands and causes of action of every kind and character arising from pollution or contamination, which originates above the surface of the land or water from spills of fuels, lubricants, motor oils, pipe dope, paints, solvents, ballast, bilge and garbage, except unavoidable pollution from reserve pits, wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities.

(b) Operator shall assume all responsibility for, including control and removal of, and shall protect, defend and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from all other pollution or contamination which may occur during the conduct of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of all drilling fluids, including, but not limited to, all emulsion, oil base or chemically treated drilling fluids, contaminated cuttings or cavings, lost circulation and filtration materials and fluids. Operator shall release Contractor and its suppliers, contractors and subcontractors of any tier of any liability for the foregoing.

(c) In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator, for whom such party is performing work, is held to be legally liable, the liability shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations respecting protection, defense, indemnity and limitation of responsibility and liability, as set forth in (a) and (b) above, shall be specifically applied.

14.12 Consequential Damages: Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against its own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties. Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.

14.13 Indemnity Obligations: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraphs 4.9 and 6.3(a), Paragraphs 10 and 12, and Subparagraphs 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof (including, but not limited to, pre-existing conditions, defect or ruin of premises or equipment), strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, the negligence of any degree or character (regardless of whether such negligence be sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their co-venturers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any rights to indemnification in any person or entity not a party to this Contract, either as a third party beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

15.   AUDIT

If any payment provided for hereunder is made on the basis of Contractor's costs, Operator shall have the right to audit Contractor's books and records relating to such costs. Contractor agrees to maintain such books and records for a period of two (2) years from the date such costs were incurred and to make such books and records readily available to Operator at any reasonable time or times within the period.

16.   NO WAIVER EXCEPT IN WRITING

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either party unless the same is done in writing, and then only by the persons executing this Contract, or either duly authorized agent or representative of the party.

17.   FORCE MAJEURE

Except as provided in this Paragraph 17 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes acts of God, action of the elements, wars (declared or undeclared), insurrection, revolution, rebellions or civil strife, piracy, civil war or hostile action, terrorist acts, riots, strikes, differences with workmen, acts of public enemies, federal or state laws, rules, regulations dispositions or orders of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government), inability to procure material, equipment, fuel or necessary labor in the open market, acts and unusual labor or material, equipment or fuel shortages, or any other causes (except financial) beyond the control of either party. Neither Operator nor Contractor shall be required against its will to subject any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the a Force Majeure Rate provided for in Subparagraph 4.6 above.

18.   GOVERNING LAW:

Form provided by Forms Go-A-Click
(214) 340-6420 • FormsGoAClick.com

# LLOYD'S

Lloyd's of London

## Control of Well Insurance Certificate

*Effected 100%, Underwriters @ Lloyds, London, Brit Syndicate 2987*
*through*
*AmWINS Brokerage of Texas, inc.*

Prior Policy Number: AMW116270

Authority Reference: RARSP1200142

# DECLARATIONS

This is not a comprehensive insurance certificate. It contains specific definitions and significant exclusions and limitations.
It should be read carefully by the Insured

Issue Date: May 17, 2012

Certificate No.: AMW126397

**1. NAMED INSURED:** Miramar Petroleum Inc.
And/or subsidiary, associated, affiliated companies or owned and controlled companies,
as now or hereafter constituted, including Officers, Directors, Stockholders and Employees
of all Named Insureds while acting within the scope of their duties as such and as their
interests may appear.

**2. MAILING ADDRESS:** 802 N. Carancahua Street, #1220
Corpus Christi, Texas  78401

**3. CERTIFICATE PERIOD:** From:     May 16, 2012 to May 16, 2013
*both days at 12.01 a.m. Local Standard Time at the address of the Named Insured*
*as stated above.*

IN RETURN FOR PAYMENT OF PREMIUM, AND SUBJECT TO THE TERMS OF THIS CERTIFICATE, WE AGREE
TO PROVIDE INSURANCE COVERAGE AS STATED IN THE ATTACHED POLICY FOR THE PROPERTY SCHEDULED.

**4. COVERAGE & FORM:** Subject always to the Common Conditions herein, and as provided for in the Declarations
and the following sections herewith:

| | |
|---|---|
| **FORM:** | Brit Control of Well Wording |
| Section 1A | Well Out of Control Insurance |
| Section 1B | Redrill/Extra Expense |
| Section 1C | Seepage, Pollution, Cleanup and Contamination |
| Section 2 | Care, Custody and Control |
| **CONDITIONS:** | Extended Redrill |
| | Making Wells Safe |
| | Evacuation Expenses |
| | Removal of Wreck |
| | Turnkey Wells |
| | Areas (All Land Wells less than 10,000' are rated Area 1) |
| | War and Terrorism Exclusion Endorsement |
| | Institute Extended Radioactive Contamination Exclusion Clause |
| | Micro-Organism Exclusion |
| | Information Technology Hazards (Risk) Exclusion Clause |
| | Institute Chemical, Biological, Bio-Chemical and Electromagnetic Weapons Cyber Attack Exclusion Clause |
| | Semi-Annual Reporting and Payment of Well Activity |
| | TRIA Not Purchased Endorsement |

Any claims hereon to be agreed between Approved Adjuster and Leading Underwriter only
And such agreement to be unconditionally binding on all other Underwriters.
Settlement to be made against proof of loss issued by Approved Adjuster.

*All Limits are for 100% Interest*

**5. LIMIT OF LIABILITY:** Section 1A, B, C   $3,000,000   (100%) any one Occurrence Combined Single Limit
including Defense Expenses in respect of 100% interest,
subject to a combined single limit of liability for all coverages
provided in Section 1 and 2.

Section 2         $500,000     (100%) any one Occurrence

*The Limit of Liability specified in these Declarations is excess of the Insured's Retention(s).*

**6. RETENTION:** Section 1A, B, C:   $50,000   (100%) any one Occurrence, Combined over all sections
Section 2:        $50,000   (100%) any one Occurrence

**7. WELL INFORMATION:** *It is understood and agreed that any drilling/workover wells other than those declared to*
*underwriter at inception are to be agreed prior to spud for inclusion hereon.*

EX "B"

CC.  The term "side track" shall be defined as an operation involving the use of a portion of an existing well to drill a new well.

DD.  "true vertical depth" means the deepest point below the surface of the ground or water bottom in the lowest "producing" zone, reached by a "well".

EE.  "turnkey well" means a "well" drilled by an independent "drilling" contractor under a contract which provides that the parties agree on a fixed sum of money that will be paid to the "drilling" contractor in return for his furnishing a "drilling" crew, "drilling" equipment and certain specified materials and services, to be due and payable only after the hole is drilled to contract depth; all other services, materials are furnished at the cost of the "well" owners.

FF.  The term "underbalanced" shall be defined as that method of drilling whereby the terrestic pressure is likely to exceed the pressure exerted by the drilling fluid column in the bore of the well.

GG.  The term "well" shall be defined as a hole bored into the earth with the intention of discovering, delineating, injecting, producing from or exploiting and enhancing the recovery of oil and/or gas and/or sulphur and/or water and/or thermal energy resources or deposits, including such conductor, casing, liner and/or tubing as may have been installed therein and such wellhead, christmas tree, blowout preventer or mechanical pressure control equipment as may have been installed immediately above the bore of a Well.

HH.  The term "well(s) insured" shall be defined as oil and/or gas and/or thermal energy Wells and/or geothermal and/or stream and/or sulphur and/or salt water disposal/injection and/or other mineral Wells:

1. while being drilled, deepened, serviced, worked over, completed and/or reconditioned until "completion" or abandonment as set forth in Clause 1 of these Common Conditions:

2. while "producing",

3. while "shut-in"; or

4. while "plugged and abandoned";

For the account of the Assured and as may be included within the areas and types of Wells insured as set forth in the Declarations hereto.

II.  The term "well out of control" shall be defined as a Well insured from which and only when there exists an unintended flow of drilling fluid, oil, gas, water, or other substance, either above the surface of the ground or water bottom or emanating from one subsurface depth interval to another subsurface depth interval via the bore of a Well insured, and

1. Which flow cannot be (a) stopped by use of the equipment on site and/or the blowout preventer, storm chokes or other equipment required by Clauses 5 and 14 of the Common Conditions; or (b) stopped by increasing the weight by volume of drilling fluid or by the use of other conditioning materials in the Well; or

2. Which flow is declared to be out of control by the appropriate Regulatory Authority.

Nevertheless, and for the purposes of this insurance, a Well shall not be defined as a Well Out of Control because of the existence of Occurrence of a flow of oil, gas or water or other substance into the Well bore which can be circulated out or bled off through the surface controls.

JJ.  The term "well brought under control" shall be defined as a Well Out of Control at such time that the flow giving rise to a claim hereunder stops, is stopped or can be stopped and drilling. deepening, servicing, workover, completion, reconditioning or other operation(s) taking place in the Well immediately prior to the Occurrence giving rise to a claim hereunder is (are) resumed or can be resumed or the Well is or can be returned to whatever status that existed immediately prior to the Well becoming a Well Out of Control: or the flow giving rise to a claim hereunder is or can be safely diverted into commercial production; unless the Well continues at that time to be declared a Well Out of Control by the appropriate Regulatory Authority, in which case, for the purpose of this insurance, the Well shall be deemed to be a Well Brought Under Control when such authority ceased to designate the Well(s) as being a Well Out of Control.

KK.  "wellhead assembly" means the equipment used to confine and control flow of fluids or gas from the "well" which equipment is made up of a combination of parts called casing head, tubing head and valves commonly called the christmas tree.

LL.  The term "workover" shall be defined as those operations to rehabilitate, restore, increase production of oil and/or gas and/or thermal energy resources and/or deposits.

## SECTION 1A

## WELL OUT OF CONTROL

**COVERAGE**

Underwriters agree subject to the Combined Single Limit of Liability, terms and conditions of this Certificate, to reimburse the Assured for expenses incurred:

(a) in regaining or attempting to regain control of a Well Out of Control including any other Well which gets out of control as a direct result of a Well Out of Control; and

(b) in extinguishing or attempting to extinguish (1) fire above the surface of the ground or water bottom from a Well Out of Control or any other Well(s) which are burning as a direct result of a Well Out of Control or (2) fire above the surface of the ground or water bottom which may endanger the Well(s) insured.

In any circumstances, Underwriters' liability for expenses incurred in regaining or attempting to regain control of Well(s) Out of Control shall cease when it becomes a Well Brought Under Control.

**EXPENSES**

Expenses recoverable hereunder shall include costs of materials and supplies required, the services of individuals or firms specialized in controlling Well(s) Out of Control and directional drilling and similar operations necessary to regain control of the Well(s) Out of Control, including costs and expense incurred at the direction of regulatory authorities to regain control of the Well(s) Out of Control, and other expenses included within Clause 1 of this Section 1A.

**TERMINATION OF EXPENSES**

In any circumstances, Underwriters' liability for expenses incurred in regaining or attempting to regain control of a Well(s) Out of Control shall cease when it becomes a Well Brought Under Control.

**EXCLUSIONS**

There shall be no indemnity or liability under this Section for:

a. any loss of or damage to any drilling or production equipment;

b. any loss of or damage to any Well or Wells, or hole or holes;

c. any loss, damage or expense caused by or arising out of delay (including delayed and/or deferred production) and/or loss of use and/or loss of or damage to production (including that due to loss of reservoir pressure) and/or loss of or damage to any reservoir or reservoir pressure.

RARSP1200142

## SECTION 1B

### REDRILLING/EXTRA EXPENSE

**COVERAGE:**

Underwriters agree, subject to the Combined Single limit of Liability, terms and conditions of this Certificate to reimburse the Assured for actual costs and expense incurred to restore or redrill a Well insured or any part thereof, which has been lost or otherwise damaged as a result of an Occurrence giving rise to a claim which would be recoverable under Section 1A of this Certificate if the Assured's Retention applicable to Section 1A were nil, subject to the following conditions:

a.    Underwriters shall in no event be liable for any improvements or betterments to the Well.

b.    There shall be no coverage under this Section 1B for restoration or redrilling of any Well whose flow can be safely diverted into production, including by completing through drill stem left in the Well insured, or which can be complete through a relief Well(s) drilled for the purpose of controlling a Well Out of Control.

c.    In no event shall Underwriters be liable for costs and expenses incurred (a) with respect to drilling Wells, to drill below the depth reached when the Well because a Well Out of Control and (b) with respect to producing or shut-in Wells, to drill below the geologic zone or zones from which said Well(s) insured was (were) producing or capable of producing.

d.    In any circumstances, Underwriters' liability under this Section 1B for costs and expenses shall cease (1) if actual restoration or redrilling has not commenced within 730 days after the date of the Occurrence giving rise to coverage under this Section 1B; and (2) in any event when the depths set forth in Paragraph 1c of this Section 1B have been reached and the Well restored to a condition comparable to that existing prior to the Occurrence giving rise to the claim, or so far as possible utilizing generally available equipment and technology.

**EXCLUSIONS:**

There shall be no indemnity or liability under this Section for:

a.    any loss of or damage to any drilling or production equipment;

b.    any loss, damage or expense caused by or arising out of delay (including delayed and/or deferred production) and/or loss of use and/or loss of or damage to production (including that due to loss of reservoir pressure) and/or loss of or damage to any reservoir or reservoir pressure;

c.    costs and/or expenses incurred to restore or redrill any relief Well, or any part thereof;

d.    any claim recoverable under this Section solely by reason of the addition or attachment to Section 1A of this Certificate of the Making Wells Safe Section;

e.    redrilling and/or restoration or for in-hole equipment in respect of any Well that was plugged and abandoned prior to loss or damage covered under Section 1A hereof and that remained plugged and abandoned at the time of such loss or damage.

RARSP1200142

## SECTION 1C

### SEEPAGE AND POLLUTION AND CONTAMINATION

1. INSURING AGREEMENTS

Underwriters, subject to the Combined Single Limit of Liability, terms and conditions of this Certificate, agree to indemnify the Assured for:

a.  All sums including defense costs which the Assured shall by law or under the terms of any oil and/or gas and/or thermal energy lease and/or license be legally liable to pay for the costs of remedial measures and/or as damages for bodily injury (fatal or nonfatal) and/or loss of, damage to or loss of use of property caused by or alleged to have been caused directly by seepage, pollution or contamination arising from Wells insured;

b.  The cost of, or of any attempt at, removing, nullifying ,or cleaning up seeping, polluting or contaminating substances emanating from Wells insured herein, including the cost of containing and/or diverting the substances and/or preventing the substances reaching the shore;

provided always that such seepage, pollution or contamination manifests itself above the surface of the ground or water bottom and results from both:

1.  An Occurrence during the period of this insurance (including any continuation thereof provided for by Clause 17 of the Common Conditions) for which notice has been given by the Assured to Underwriters within 180 days from the date of the Occurrence and

2.  A Well Out of Control giving rise to a claim which would be recoverable under Section 1A of this Certificate if the Assured's retention applicable to Section 1A were nil.

#### COST AND APPEALS CLAUSE:

In the event of any claim and/or series of claims arising out of one Occurrence where the Assured's final gross claim is likely to exceed the retention of the Assured, no costs shall be incurred on behalf of Underwriters without the consent of Underwriters, and if such consent is given, Underwriters shall consider such costs as part of the final claim hereunder.  No settlement of losses by agreement shall be effected by the Assured without the consent of Underwriters where the Assured's final gross claim will exceed the retention of the Assured.

In the event that the Assured elects not to appeal against a judgment in excess of the retention of the Assured, Underwriters may elect to conduct such appeal at their own cost and expense, and shall be liable for the taxable cost and interest incidental thereto, but in no event shall the liability of Underwriters exceed the Combined Single Limit of Liability over Section 1 of this Certificate.

#### EXCLUSIONS:

There shall be no indemnity or liability under this Section for:

a.  any loss of or damage to any drilling or production equipment at the site of any Well insured herein;

b.  any claim arising directly or indirectly from seeping, polluting or contaminating substances beneath the surface of the ground or any water bottom; or

c.  any claim arising directly or indirectly out of seepage, pollution or contamination which:

1.  is deliberate from the standpoint of the Assured or any other person or organization acting for or on behalf of the Assured; or

2.  results directly from any condition which is in violation of or non-compliance with any governmental rule, regulation or law applicable thereto; or

d.  bodily injury

1.  arising out of Occupational Disease

2.  to any employee, including leased or borrowed employees

e.  any workers' compensation, unemployment compensation or disability laws, statutes, or regulations.

## SECTION 2

### CARE CUSTODY AND CONTROL

1. In consideration of payment of an additional premium (included) and subject to its Declarations and General Conditions, this Certificate covers the Assured's legal or contractual liability as oil lease operator(s) (or Co-Venturer(s) where applicable) for physical loss or damage to, or expenses of salvage of, oilfield equipment, including but not limited to drill pipe, drill collars, subs, drill bits and core barrels, leased or rented by the Assured or in its care, custody and control at the site of any Well insured under Section 1A of this Certificate.

2. Underwriters' liability in respect of claims under this Section is limited to $(see Declarations) in respect of One Hundred Percent (100%) interest, any one Occurrence, which shall be separate from and in addition to the Combined Single Limit of Liability set forth in the Declarations.

3. Underwriters' Limit of Liability specified in Clause 2 of this Section shall be excess of the Assureds Retention of $(see Declarations) in respect of One Hundred Percent (100%) interest, any one Occurrence which shall be separate from and in addition to the Assureds Retention(s) set forth in the Declarations.

4. In the event that in-hole salvage expenses or fishing costs are incurred in respect of equipment for which the Insured has assumed responsibility and which is lost or damaged as a result of a peril insured against in this Section, the maximum amount recoverable for such salvage expenses or fishing costs shall be Twenty Five Percent (25%) of the value of the lost or damaged equipment in the hole at the time of loss and which is the object of salvage or fishing efforts, always subject to the overall limit of liability specified for this Section (see Declarations).

5. Notwithstanding anything contained herein to the contrary, Underwriters shall not be liable for claims in respect of loss of or damage to:

   a. equipment owned by the Assured or in which the Assured has a financial interest;

   b. drilling or Work over rigs or any component thereof;

   c. diamond bits and/or diamond bit core barrels;

   d. mud, chemicals, cement, the Well or casing installed therein;

   e. in-hole equipment whilst in the hole, unless the Assureds liability has resulted from physical loss or damage to such equipment as a result of (1) an Occurrence giving rise to a claim which would be recoverable under Section 1A of this Certificate if the Assureds Retention applicable to Section 1A were Nil, or (2) fire, windstorm or total loss of drilling or Work over rig.

6. This extension shall not cover or contribute to any loss, damage or expense caused by or resulting from the delay; loss of use; wear, tear, gradual deterioration; mysterious disappearance; inventory shortage(s); explosion, rupture or bursting of engines, pumps, electrical injury or disturbance to electrical appliances or wiring resulting from artificial or natural cause (unless fire ensures, and then from loss or damage by fire only); latent defect; faulty design; mechanical failure or breakdown of equipment leased or rented by the Assured or in the Assured's care, custody and control.

7. Underwriters shall not be liable for loss of or damage to equipment beyond the actual sound value of such equipment at the time of loss, ascertained with proper deductions for depreciation, wear, tear and obsolescence. As respects leased or rented equipment, Underwriters shall not be liable for any sum greater than that assumed by the Assured under the terms of the rental or lease agreement less any trade or volume discount allowed by the leasing or rental company, nor shall Underwriters' liability exceed what it would cost to repair or replace any equipment involved in any loss recoverable hereunder with other equipment of like kind and quality.

8.  This Section shall not afford coverage with respect to any drilling operation performed for the Assured, or for the account of the Assured by another operator, upon which a written contract with the drilling contractor has not been executed in advance of commencing drilling operations, or within Forty Eight (48) hours thereafter, incorporating all the provisions and conditions to be effective as respects such drilling operations. Further, this Section shall not extend to any oral agreements prior to, subsequent to or simultaneously with the execution of the written contract on such operations, and this Section shall not extend to any subsequent written agreement or rider to the original contract, other than to deepen any Well below the specified total depth of the original contract, affecting the assumption of liability by the Well owner for the contractor's equipment.

Underwriters shall have no liability for loss of or damage to equipment if the drilling contract is negotiated on a turnkey or completed Well basis.

RARSP1200142

**ENDORSEMENT**

**UNDERGROUND CONTROL OF WELL**
**(BDI - 1002)**

1. **INSURING AGREEMENT**

Subject to the Combined Single Limit(s) of Liability and Retention(s) contained in the SCHEDULE OF LIMITS, SCHEDULE OF RETENTIONS and the Terms and Conditions of the Contract of Insurance to which this endorsement is attached and in consideration of an Additional Premium of $(Included), it is agreed that the definition of a "Well Out Of Control" is amended to read as follows:

For the purposes of this insurance, a well(s) shall be deemed to be out of control only when there is a sudden, accidental, uncontrolled and unintended continuous flow, above the surface of the ground (or water bottom in a well drilled over water) or from one subterranean stratum to another subterranean stratum through the bore of the well insured hereunder of drilling fluid, oil, gas or water or other substance:

A.   which flow cannot promptly be:

(I.)   stopped by use of the equipment on site and/or the blowout preventer, storm chokes or other equipment required by the Due Diligence and Conditions clauses herein; or

(II.)   stopped by increasing the weight by volume of drilling fluids or by the use of other conditioning materials in the well(s); or

B.   which flow is declared to be out of control by the appropriate regulatory authorities, where applicable.

Nevertheless and for the purposes of this insurance, a well shall not be deemed to be out of control solely because of the existence or occurrence of a flow of oil, gas, or water into the well bore which can, within a reasonable period of time, be circulated out or bled off through surface controls.

It is further understood and agreed that, Paragraph B of the Insuring Agreements of the CONTROL OF WELL INSURANCE is amended to read as follows:

B.   With respect to expenses of well control, Underwriters' liability ceases:

(I.)   If fire only is involved - when the fire is extinguished;

(II.)   If fire is involved and a well is out of control - when the fire is extinguished and the well is brought under control above and below the surface of the ground (or water bottom in the case of a well located in water).

(III.)   If a well is only out of control without fire being involved - when the well is brought under control above and below the surface of the ground (or water bottom in case of a well located in water).

2. **EXCLUSIONS**

The coverage provided by this endorsement is not extended to any claim arising directly or indirectly from seepage, pollution or contamination underground if such seepage, pollution or contamination results from a Well Out Of Control underground, as defined above.

All other terms and conditions remain unchanged.

Ex "C"

MIRAMAR PETROLEUM, INC.
#1 SARTWELLE
JACKSON COUNTY, TEXAS

SECTION 1A
EXPENSES - BRING THE WELL UNDER CONTROL

| | |
|---|---:|
| RIG TIME | 58000.00 |
| DRILLING MUD (ADF) | 55482.01 |
| DRILLING MUD (MCADA) | 39422.76 |
| MD TOTCO SOLUTIONS DRILLING RECORDER | 2229.92 |
| MUD LOGGER | 3400.00 |
| DRILLING FUEL | 15850.48 |
| SUPERVISION | 5900.00 |
| TELEDRIFT RENTAL | 1580.00 |
| JAR RENTAL | 1234.04 |
| MOBILE HOME RENTAL | 1736.20 |
| FORKLIFT RENTAL | 1840.00 |
| WATER LINE RENTAL | 584.88 |
| FRAC TANK RENTAL | 213.36 |
| TRASH TRAILER RENTAL | 930.00 |
| WIRELESS INTERCOM | 488.80 |
| STABILIZERS | 5900.00 |
| CEMENT DRILL PIPE | 9591.04 |
| BHP AND POTENTIAL TEST | 8271.90 |
| 4 DAY FLOW TEST | 21018.00 |
| | ---------------- |
| | 233673.39 |
| | ========== |

EX "D" pg 1 OF 4

MIRAMAR PETROLEUM, INC.
#1 SARTWELLE WELL
JACKSON COUNTY, TEXAS

| SECTION 1-B | REDRILL |
|---|---|
| REDRILL COSTS | |
| RAILROAD COMMISSION OF TEXAS - PERMIT | 1000.00 |
| SURFACE DAMAGES | 5000.00 |
| SWAGE | 1320.00 |
| CONDUCTOR PIPE SET AT 60 FEET, RATHOLE & MOUSEHOLE | 12331.35 |
| ROAD, PAD & PITS | 65000.00 |
| STAKE LOCATION | 2350.00 |
| 2000 FEET 8 5/8" SURFACE CASING WITH TOP 2 JOINTS 9 5/8" | 32032.48 |
| CEMENT FOR SURFACE CASING | 20341.96 |
| FRESH WATER | 917.00 |
| CASING CREW FOR SURFACE CASING | 11722.50 |
| FLOAT EQUIPMENT FOR SURFACE CASING | 2598.45 |
| WELDER FOR SURFACE CASING | 3807.00 |
| RIG TIME TO DRILL TO 8700 FEET & LOG (16 DAYS @ $15,000/DAY MOBILIZATION & DEMOBILIZATION | 350000.00 |
| FUEL | 58500.00 |
| 4 DRILL BITS | 33430.00 |
| DRILLING MUD | 167269.51 |
| MUD LOGGER | 12750.00 |
| TELEDRIFT RENTAL | 6320.00 |
| SUPERVISION (15 DAYS @$1500/DAY) | 22500.00 |
| JARS, SUBS & STABILIZERS | 10485.09 |
| WATER | 5000.00 |
| VACUUM TRUCK | 5397.30 |

Pg 2 of 4

SECTION 1-B   REDRILL COSTS (PAGE 2)

| | |
|---|---:|
| LAYDOWN MACHINE/CASING TONG | 11722.50 |
| MD TOTCO | 9919.70 |
| SCHLUMBERGER WELL LOG AT 8700 FEET | 19204.47 |
| SPACER SPOOL | 920.60 |
| MOBILE HOME RENTAL | 3972.41 |
| FORKLIFT RENTAL | 3009.74 |
| CASING HEAD | 3172.61 |
| WATER LINE & PUMP | 7552.30 |
| TEST BOP'S | 3117.00 |
| FRAC TANK RENTAL | 960.76 |
| TRASH TRAILER | 1377.08 |
| WIRELESS INTERCOM | 1588.57 |
| TRANSPORTATION CHARGES | 7500.00 |
| | ------------------ |
| | 904090.38 |
| | ========== |

pq 3 of 4

**MIRAMAR PETROLEUM, INC.**
**#1 SARTWELLE**
**JACKSON COUNTY, TEXAS**
**SECTION 2**
**CARE, CUSTODY AND CONTROL**
**EQUIPMENT LOST IN HOLE**

| CONTRACTOR | DESCRIPTION | PRICE |
|---|---|---|
| NICKLOS DRILLING | DRILL PIPE: DRILL COLLARS; SUBS | 485,283.96 |
| TELEDRIFT | TOOLS | 16,912.50 |
| SMITH BITS | 7 7/8" MILLED TOOTH BITS | 9,314.10 |
| WEATHERFORD | JARS | 79,681.55 |
| STABIL DRILL | STABILIZERS | 5,068.57 |
| | | 596,260.68 |

MAXIMUM CONTRACTUAL LIABILITY REDUCED TO:    450,000.00

**TOTAL DUE:**    **450,000.00**

pg 4 of 4